IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 25, 2016 at Knoxville

**STATE OF TENNESSEE v. TRAVIS DEWAYNE MELTON**

**Appeal from the Circuit Court for Overton County**
**No. 2013-CR-5     David A. Patterson, Judge**
_____

**No. M2015-02421-CCA-R3-CD – Filed December 22, 2016**
_____

Travis Dewayne Melton ("the Defendant") appeals his Overton County convictions for reckless homicide and assault, for which the Defendant received an effective sentence of four years' incarceration. The Defendant contends that: (1) the trial court erred by instructing the jury on lesser included offenses when the Defendant requested that the trial court not charge any lesser included offenses; (2) his dual convictions for assault and reckless homicide violated double jeopardy principles; and (3) the evidence was insufficient to support his convictions. After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and J. ROSS DYER, JJ., joined.

Michael R. Giaimo, Cookeville, Tennessee, for the appellant, Travis Dewayne Melton.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Bryant C. Dunaway, District Attorney General; and Derek K. Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

This appeal involves the shooting death of Donnie Wayne Tayes ("the victim") following an incident at the Defendant's home in the early morning hours of September 17, 2012, involving the Defendant, the victim, and the victim's wife, Angel Tayes. Based

upon the events of that morning, the Overton County Grand Jury indicted the Defendant for the following offenses:

| Count | Offense | Victim |
|---|---|---|
| 1 | First Degree Premeditated Murder | Donnie Wayne Tayes |
| 2 | Aggravated Kidnapping | Angel Tayes |
| 3 | Assault | Angel Tayes |
| 4 | Assault | Angel Tayes |

At trial, Brad Tayes testified that he and his girlfriend, Rachel Barnes, were at the Defendant's residence on September 16, 2012, until about 8:00 p.m. when his sister-in-law, Angel Tayes, arrived with groceries for the Defendant. As he left the Defendant's trailer, Mrs. Tayes told Brad[1] that the victim was "at home asleep." Around midnight that same night, the victim called Brad and asked if he had seen Mrs. Tayes. Brad told the victim that he had seen Mrs. Tayes at the Defendant's residence earlier that evening. When the victim asked for a ride to the Defendant's house, Brad told the victim that he would have to ask Ms. Barnes because he did not have a driver's license. However, when he got off the phone, Brad went back to bed and did not wake up Ms. Barnes. About an hour later, the victim called again and said, "[A]re you going to take me nor not . . . it's my wife." Brad and Ms. Barnes picked up the victim and took him to the Defendant's residence. When they arrived, the victim jumped out of the window of Brad's truck, went to the front door of the Defendant's trailer, and kicked the front door open. Brad then saw the victim inside the Defendant's living room talking to Mrs. Tayes. Brad told Ms. Barnes that he did not want to get involved because he had to work the next day, so they went home.

Brad testified that the victim did not have any weapons when they arrived at the Defendant's residence on the morning of September 17, 2012. He explained that, a few days before this incident, the victim asked him if the Defendant and Mrs. Tayes were having a sexual relationship. Brad told the victim that he "didn't think that nothing [sic] was going on." Brad stated that the victim initially agreed that he would get his car from the Defendant's residence and go home. However, when they arrived at the Defendant's trailer, the victim got "really upset." Brad acknowledged that the victim was known to carry a knife, but he stated that he did not see the victim with one that morning.

---

[1] Because several witnesses share the same surname, we will refer to some witnesses by their first names. No disrespect is intended.

Rachel Barnes[2] testified that, on the night of the shooting, the victim called her and Brad between midnight and 1:00 a.m. and asked for a ride to "find his wife." When Ms. Barnes and Brad picked up the victim, he appeared "[f]rustrated." The victim said he wanted to get his car, wallet, and cigarettes from Mrs. Tayes and then return home. However, when Ms. Barnes drove the victim to the Defendant's residence, the victim jumped out of the truck window as soon as she pulled into the driveway. The victim went to the front porch, looked in a window, and then kicked in the front door. Ms. Barnes saw the victim talking to someone sitting on a couch in the living room. The victim then sat in a chair, leaving the front door "wide open." Ms. Barnes stated that she saw no other cars in the Defendant's driveway when she pulled in. She further stated that she never saw the victim with weapons that morning. Ms. Barnes acknowledged that the victim was concerned that his wife was having an affair with the Defendant. She explained that because Brad had to go to work later that day that she and Brad left the victim at the Defendant's residence and returned home.

Angel Tayes testified that, before his death, the victim began abusing pills and had "done meth a couple of times." Beginning in March 2011, Mrs. Tayes also noticed that the victim was having "personality issues" and seizures, but they did not know the cause of these problems. She stated that the victim had more than one personality and that the victim would refer to himself in third person. She explained that one of the victim's personalities was "him as a child and he was scared a lot and he would . . . cry." Mrs. Tayes stated that something would "trigger one of the different personalities to come out" and that she had seen different personalities from the victim fifteen to twenty times. She further stated that, even though some of the victim's "personalities" were violent, the victim never saw a psychiatrist about this problem. Mrs. Tayes recalled that, on the night of the homicide, the victim "spoke with a different accent" and "in a different language."

According to Mrs. Tayes, she and the victim went to the Defendant's trailer on the morning of September 16, 2012, to do their laundry because the water at their house had been cut off. After a few hours, Mrs. Tayes and the victim began "bickering," and Mrs. Tayes decided to drop off the victim at their residence while she went grocery shopping for the Defendant. Mrs. Tayes went to a grocery store and then stopped at a market to buy cigarettes and beer for the Defendant. When she returned to the Defendant's trailer between 8:00 and 9:00 p.m., the victim's brother, Brad, was there. However, Brad left the trailer shortly after she returned.

Mrs. Tayes testified that she had known the Defendant for six months before the victim's death. She admitted that, about a month before the homicide, she and the

---

[2] Ms. Barnes was called to testify by the Defendant, but we have included her testimony here as it was substantially similar to Brad's testimony.

Defendant had sex one time while the victim was in jail and she was "really intoxicated." She recalled that the victim "could see a connection" between her and the Defendant, and the victim was suspicious of their relationship. However, she denied having sex with the Defendant on the night of the shooting. Instead, Mrs. Tayes stated that she "lost track of time" while talking to the Defendant and folding laundry. The Defendant told her that he needed to take a shower, and she fell asleep on the couch in the living room.

Mrs. Tayes stated that she woke up when the victim "kicked the door in." The victim accused Mrs. Tayes of having sex with the Defendant. When Mrs. Tayes denied his accusation, the victim went to the Defendant's bedroom and yelled at the sleeping Defendant to "wake up." When he got no response from the Defendant, the victim again accused Mrs. Tayes of having sex with the Defendant, and she continued to deny it. The victim asked Mrs. Tayes "why [she] would do this to him[,]" and he began pacing back and forth in front of the couch. Mrs. Tayes recalled that a friend of the Defendant's "showed up" around this time and knocked on the front door. When the victim started talking to the Defendant's friend, Mrs. Tayes went out to her car. Eventually, the friend left, and she and the victim went back inside the Defendant's residence.

Once inside, the victim "started talking differently[.]" According to Mrs. Tayes, he began speaking with an Irish accent and referring to himself in third person. The victim asked Mrs. Tayes how she "could hurt Wayne like that[.]" The victim said "he had told [her] before if [she] ever hurt Wayne again he would kill [her]." The victim then pinned Mrs. Tayes to the couch and began choking her. Mrs. Tayes fought the victim and yelled for the Defendant. She testified that she almost "blacked out a couple of times," and she thought that the victim was going to kill her.

Mrs. Tayes recalled that, at one point, the victim allowed her to use the restroom. When she returned to the living room, the victim retrieved a machete from the Defendant's front porch, and the victim said he was going "to kill [the Defendant] with it[.]" The victim set the machete down behind a speaker in the living room, sat in a chair, and told Mrs. Tayes to "come here." At that time, the Defendant's friend returned to the trailer, and he spoke to the victim. Mrs. Tayes went into the Defendant's bedroom and hit the Defendant on the leg "as hard as [she] could . . . to wake him up." The victim then told Mrs. Tayes to "come here." Mrs. Tayes initially told the victim "no" and picked up the machete. However, the victim forced her sit on his lap and put the machete to his neck. He told her, "go ahead, kill Wayne." Mrs. Tayes testified, "I remember the last thing that he said to me was you're going to kill Wayne tonight. And I looked at him and I said, no, I'm not. And he looked towards the [Defendant's] bedroom and he said, oh, but he will." Mrs. Tayes took the machete from the victim and put it behind the television. When the victim came towards her, she ran towards toward the bathroom. At that time, the Defendant came out of his bedroom with a rifle and yelled at the victim,

"[W]hat the hell are you doing in my house[?]" The victim ran out the back door of the trailer, and the Defendant followed him. Mrs. Tayes testified that the Defendant stood on his back porch and shot the victim. She stated that the victim did not threaten the Defendant; the victim opened the back door and "took off running." She further stated that the victim did not have the machete, and she did not believe that the victim had any other weapons with him.

Mrs. Tayes recalled that she went outside and saw the victim lying in the yard, face down. The victim was moaning, and he was still breathing. She put her hand on his back to try to stop the bleeding, and she told the Defendant that they needed to call 911. However, the Defendant replied, "[H]ell no, we don't." Mrs. Tayes pulled out her cell phone from her pocket and walked towards the road to attempt to flag down a car. Mrs. Tayes could not get a cell phone signal inside the Defendant's trailer, and she knew that "there was one spot in the driveway that you could get a signal." When she told the Defendant that she was calling 911, the Defendant threatened, "[G]ive me the . . . phone before I f***ing shoot you." She walked back towards the Defendant and told him that she had dropped her phone. However, the Defendant grabbed her arm, bent it over a fence in the yard, and said he was going to "break [her] f***ing arm" if she did not give him the phone. In their struggle over the cell phone, the Defendant bent over and bit Mrs. Tayes's nose, and it started bleeding. She gave the Defendant her cell phone, and he threw the phone, breaking it. Mrs. Tayes went back to the victim and tried to roll him over. However, the Defendant told her to go inside the trailer and would not let her stay outside with the victim.

Mrs. Tayes testified that the Defendant did not help the victim or call 911, despite having a landline at his residence. The Defendant told her that they had to "get this s*** straight" before calling the police. At that time, deputies arrived at the residence and began knocking on the front door. Mrs. Tayes answered the door and initially told the deputy that she was okay. However, she then walked out the front door and told the deputies that the victim was in the back yard, that he might still be alive, and that the Defendant had shot him. Mrs. Tayes testified that she never heard the victim tell the Defendant that he was going to kill him, and she did not see the victim make any movements toward the Defendant. Moreover, she testified that the victim had no weapons at the time he was shot.

On cross-examination, Mrs. Tayes stated that it was well-known that the victim had a drug problem. She also acknowledged that the victim was suspicious of her relationship with the Defendant, and the victim confronted her about the nature of their relationship. She agreed that she had been trying to make the victim jealous on the night of the shooting. She stated that the victim was upset and angry, and when he pinned her

down on the couch and choked her, she thought the victim would kill her. Mrs. Tayes reiterated that the victim said he was going to kill her, the Defendant, and himself.

Mrs. Tayes stated that the victim became angry when she refused to sit on his lap a second time. He came toward her as she was standing in front of the Defendant's bedroom. She said that she feared for her life and was trying to get away from the victim. She stated that, when the Defendant came out of the bedroom with the rifle and went after the victim, the Defendant's back was towards her. She recalled that, after the Defendant shot the victim, she went outside and began screaming for help. The Defendant refused to call 911, and he said, "I'm not going to jail for this s***." Mrs. Tayes testified that the Defendant pointed the rifle at her when she was outside by the fence. She stated that she believed the Defendant would have killed her if she had not come back into the trailer at that point. She stated that, once they went back inside the residence, the Defendant prevented her from going back outside to the victim.

Mrs. Tayes stated that she had four children and was currently in a custody battle with her mother-in-law. However, she denied that the custody battle influenced her testimony in any way. She agreed that it had been well-known that the victim liked "throwing knives" and usually had knives with him. However, she stated that, after she woke up the Defendant, the victim did not threaten her or the Defendant with any weapons. She stated that she woke up the Defendant because she "believed he would help [her]. [She] didn't believe he would kill [the victim]."

Christa Wilson testified that on September 17, 2012, she lived on Hanging Limb Highway in a rural area in Overton County. Mrs. Wilson explained that she awoke in the early morning hours after hearing a "very loud gunshot followed by screaming." Through the open windows of her home, Mrs. Wilson heard a woman screaming, "[O]h, my God, oh, my God," and "he's okay, he's okay." She then heard a man say, "No, he's not, he's dead, I shot him dead, see all that blood, I shot him dead." Mrs. Wilson testified that the woman wanted to call for help, but the man threatened to "break her arm" if the woman called anyone. Mrs. Wilson stated that the voices were "very clear" and were coming from next door behind the Defendant's trailer. However, she could not see anything because it was still dark outside, and most of the lights inside the trailer were off.

On cross-examination, Mrs. Wilson testified that she provided law enforcement with a written statement a few hours after the shooting, and she acknowledged that the written statement did not mention the man's saying, "I shot him dead." She agreed that it was possible that she did not remember things exactly as they had happened because she was testifying two and a half years after the shooting. Mrs. Wilson stated that cell phone service in the area where her home was located was "[h]orrible," and she recalled that the

man and woman were arguing over a phone. She said that she had included in her written statement that the man threatened to break the woman's arm "if she didn't give him the phone."

Mrs. Wilson's husband, Robert Wilson, testified that early in the morning of September 17, 2012, he was working in his living room when he heard "a very loud gunshot." Mr. Wilson went into his bedroom, which faced the Defendant's trailer, and heard a woman screaming about "blood and someone being shot." The woman sounded "very distraught" and scared, and Mr. Wilson could also hear a man's voice. Mr. Wilson recalled that the man and woman were talking about a phone and that it sounded like they were struggling over something. The woman said that they "needed to get help," but the man said, "[N]o." Mr. Wilson then heard the man threaten to break the woman's arm and to "do to her what he did . . . to him." Mr. Wilson called 911 and relayed to the dispatcher what was happening. On cross-examination, Mr. Wilson testified that he heard the man say, "[H]e's dead, I shot him." Mr. Wilson acknowledged that he had no line of sight from his bedroom window and that he could not see what was happening. He explained that he and Mrs. Wilson had no cell phone service at their home and that they used "internet phones."

Deputy Brenda Keisling with the Overton County Sheriff's Department testified that she arrived at the Defendant's residence at 5:25 a.m. When she arrived, she noticed that there were no lights on inside the trailer. Deputy Keisling knocked on the front door several times, and the occupants of the trailer turned on the lights. Mrs. Tayes then opened the front door, holding a bloody towel up to her face. Mrs. Tayes was crying, and she had marks on her nose and neck. When Deputy Keisling asked if she was okay, Mrs. Tayes started to hyperventilate and could not talk. Deputy Keisling saw the Defendant sitting on a couch in the living room and asked the Defendant if he was the one "who had fired the shot," and the Defendant said that he had. Deputy Keisling testified that she asked Mrs. Tayes to step outside to talk, but she was unable to take a statement from Mrs. Tayes because Mrs. Tayes was too upset.

Deputy James Elliott with the Overton County Sheriff's Department testified that he arrived at the Defendant's residence immediately after Deputy Keisling. As Deputy Keisling was approaching the front door, Deputy Elliott went to the back of the residence where he noticed the victim lying in the back yard. The victim was "not responsive at all" and appeared to be dead. When Deputy Elliott went back around to the front of the residence, Mrs. Tayes came out of the house saying, "[H]elp me . . . he is in the back yard." Mrs. Tayes had a bloody rag in her hand and marks on her nose, eye, and cheek, and she appeared "frantic" and "distraught." Deputy Elliott told Deputy Keisling about the victim in the back yard, and they removed the Defendant from the residence. Deputy Elliott asked the Defendant what was "going on," and the Defendant calmly responded,

"[N]othing." Deputy Elliott contacted his superior officer and EMS. He then entered the residence and secured a rifle, which he located in a closet in a back bedroom. Deputy Elliott testified that, when he removed the Defendant from the residence, he did not observe any injuries to the Defendant.

Claude Stephens, a Critical Care Paramedic for Overton and Fentress County, testified that he was dispatched to the Defendant's residence on Hanging Limb Highway on the morning of the shooting. When he arrived, a deputy told him that EMS was needed behind the residence. There, Mr. Stephens found the victim lying face down in the yard. The victim had no pulse, and he was "very cold, kind of stiff in his extremities." Mr. Stephens noted what appeared to be a gunshot wound to the right side of the victim's back. Mr. Stephens then rolled the victim over and found a wound to the victim's chest. After retrieving a cardiac monitor from the ambulance, Mr. Stephens checked the victim and determined that he had no heartbeat and no "signs of life[.]" Mr. Stephens testified that he did not find any weapons on or around the victim's body.

Special Agent Billy Miller of the Tennessee Bureau of Investigation ("TBI") testified that he conducted a videotaped interview of the Defendant at the Overton County Sheriff's Department. During his interview with Agent Miller, the Defendant stated that he had been asleep when the victim arrived at the trailer. The Defendant said that he was awakened by someone "screaming, hollering, begging, and pleading[.]" The victim also said, "But you are going by my hands, or by somebody else's hands, you're going today." He heard the victim say, "It ain't him I'm after. It's you I'm after." The Defendant also heard a man speaking with an Irish accent. The Defendant stated that he got out his rifle and that, as Mrs. Tayes passed his bedroom door, she said, "[H]elp me." He said that Mrs. Tayes had a machete in her hand but was still backing away from the victim. The Defendant explained that he stepped out of the bedroom with the rifle and asked, "[H]ey what's going on[?]" At that time, both Mrs. Tayes and the victim ran. The Defendant stated that he did not know which direction Mrs. Tayes ran, but the victim ran towards the back door. The Defendant said that Mrs. Tayes was screaming, and he did not know if the victim was chasing her.

The Defendant told Agent Miller that he fired one shot towards the victim when the victim ran out the back door. He explained that he ran to the back door and shot "off the back porch[.]" The Defendant said that the victim was "already down the steps" when he fired the rifle. He claimed that he fired the rifle to scare the victim and that he was not trying to hit him. He said that he fired in the direction that the victim ran but claimed that he fired down "towards the ground[.]"

The Defendant explained that, after the shooting, Mrs. Tayes came out from a room inside the trailer, and she had blood "all over her[.]" The Defendant asked if she

was okay, and Mrs. Tayes said that the victim had attacked her and "busted her nose[.]" The Defendant asked Mrs. Tayes how the victim got inside the residence, and she told him that the victim had kicked open the front door. The Defendant stated that he reloaded his rifle and looked out a window to the front yard. He then turned on his back porch light and saw the victim lying in the back yard about twenty feet away from the porch, and he told Mrs. Tayes to check on the victim. The Defendant stated that Mrs. Tayes told him that the victim was still breathing, but he claimed that deputies arrived before he could call 911.

During his interview with Agent Miller, the Defendant initially denied having a sexual relationship with Mrs. Tayes. He claimed that he told Mrs. Tayes she could sleep on his couch the night before the shooting because she and the victim had been arguing, and she did not want to go home. However, the Defendant eventually admitted that he had sex with Mrs. Tayes that night. The Defendant denied that he threatened to hurt Mrs. Tayes if she called 911. The Defendant admitted that he took Mrs. Tayes's cell phone away from her but claimed that he did so because she could not get a signal in the front yard. He denied pointing the rifle at Mrs. Tayes. He stated that he took the rifle to the back bedroom and put it away before police arrived at the residence. The Defendant said that he did not know if the victim had a weapon but stated that the victim regularly carried "throwing knives[.]"

After interviewing the Defendant, Agent Miller interviewed Mrs. Tayes. Based upon information provided by Mrs. Tayes, Agent Miller interviewed the Defendant a second time. During this audio-recorded interview, the Defendant denied telling Mrs. Tayes that he would break her arm and that he prevented her from calling 911. The Defendant also denied biting Mrs. Tayes. He admitted that he "may have grabbed [Mrs. Tayes] by the arm" and that he broke her cell phone when he threw it against the fence. He stated that he then picked up the broken cell phone and took it into his trailer. The Defendant contended that he had acted to protect Mrs. Tayes and his property. Following this interview, Agent Miller collected buccal swabs from the Defendant, as well as the Defendant's clothing. Agent Miller testified that he took photographs of the Defendant, and the Defendant did not have any marks on his body that indicated that he had acted in self-defense.

Special Agent Steven Huntley with the TBI testified that he responded to the scene of the homicide around 7:00 a.m. Agent Huntley approached the Defendant, who was in the back of a patrol car, and advised the Defendant of his Miranda rights. The Defendant then consented to a search of his home and surrounding areas. The Defendant told Agent Huntley that he had shot the victim one time with a .243 rifle. The Defendant said that he never saw the victim with a weapon.

Agent Huntley testified that he photographed and videotaped the scene. When Agent Huntley went to the front of the trailer, he noticed that there appeared to be "wood splinters" from the front door lying in the doorway. He testified that he found two cell phones in the home; one in the window that he presumed was the Defendant's and one broken cell phone on a couch in the living room. He also found in plain view a loaded .22 rifle stuffed in the back of the couch where the broken cell phone was located. Agent Huntley did not find any blood inside the residence, and he found no weapons on the victim, who was lying in the back yard sixteen feet from the back door of the Defendant's trailer. Agent Huntley located a .243 shell lying in the back yard to the left of the back porch steps. He explained that later TBI testing determined that this shell casing had been fired from the Defendant's .243 Winchester Rossi rifle.

Agent Huntley testified that a gunshot residue test performed on the Defendant's hands was inconclusive. However, the TBI found gunshot primer residue on the Defendant's pants, indicating that the clothing was near a gun when it was fired. Agent Huntley testified that Mrs. Tayes's nose was swabbed for DNA. He stated that from the swab the TBI determined there was human saliva on Mrs. Tayes's nose; however, the DNA sample was too degraded to be able to compare it to the Defendant's DNA standard.

On cross-examination, Agent Huntley said that the victim was "shot in the back as he [was] running away." He acknowledged that there were multiple knives in the residence and stated that he found one knife lying in the floor of the second bedroom. He also observed a machete beside the couch that Mrs. Tayes was sitting on, but the machete was not collected as evidence.

Dr. Adele Lewis testified that she performed the victim's autopsy on September 18, 2012. Dr. Lewis stated that she found an entrance wound on the lower part of the right side of the victim's back and an exit wound on the upper right side part of the chest. Dr. Lewis stated that she determined that the bullet's trajectory was "from back to front, upward and towards the left." She opined that the cause of the victim's death was a gunshot wound to the torso and explained that the bullet hit the victim's right lung twice. She stated that, given the nature of the gunshot wound, she could not say if the victim died immediately but stated that it was a possibility. Dr. Lewis testified that toxicology testing performed on the victim's blood showed that the victim had both methamphetamine and marijuana in his system at the time of his death. Dr. Lewis said that methamphetamine can cause aggressive behavior, irrational reactions, convulsions, and hallucinations in the user.

Myra Bilbrey, the Defendant's aunt, testified that she had known the victim her "whole life." She recalled that, two or three days before the victim's death, she arrived home and found the victim standing on her front porch leaning against her door. She testified that it "looked like [the victim] was trying to get in." Mrs. Bilbrey asked the victim what he was doing, and the victim told her that he was looking for her husband. Mrs. Bilbrey told the victim that her husband was not home but that her son, James, was there. The victim asked why James would not answer and said that "he had about beat the door off the hinges . . . trying to get him to open the door." Mrs. Bilbrey asked the victim what he needed, and the victim said he needed coffee filters. Mrs. Bilbrey said she would get some coffee filters and told the victim to "stay right here." After she gave the victim two coffee filters, the victim told Mrs. Bilbrey that he had a brain tumor and that he only had two years to live. The victim then said that "he had a list and he was going to kill as many people as he could, particularly cops and anybody that had ever done anything to him." Mrs. Bilbrey testified that the victim specifically threatened to kill the Defendant, and she later told the Defendant about the victim's threat. Mrs. Bilbrey stated that, when she first arrived, she noticed that the victim had a knife on the porch but that he slid it inside his sleeve as she approached. She testified that she believed the victim had been trying to pry open her door with the knife.

Amanda Maynard testified she had known both the Defendant and the victim for many years. Ms. Maynard stated that she saw the victim at Carl's Market with Brad and Ms. Barnes on the evening before his death. Ms. Maynard explained that she spoke to the victim but that he was acting "[c]razy." The victim said he was "going to go back out to [the Defendant's] house and kill everybody that was around, cut them from A-hole to elbow." Ms. Maynard told the victim that he needed to go home and "sleep it off[.]" She stated that the victim had a knife strapped to his ankle. After they spoke for about fifteen minutes, the victim said he was going to the Defendant's home. Ms. Maynard explained that she saw Mrs. Tayes at the Mountain Top Store later that same night. Mrs. Tayes wanted to buy beer, and Ms. Maynard gave Mrs. Tayes some money for the beer. According to Ms. Maynard, Mrs. Tayes had a black eye and some marks on her nose and said that she had been beaten up by the victim. Mrs. Tayes told her that the victim had bitten her. Ms. Maynard further testified that, after the victim's death and while she was an inmate at the Putnam County Jail with Mrs. Tayes, Mrs. Tayes told her that "if she had to lie she was going to lie to convict [the Defendant]." On cross-examination, Ms. Maynard admitted that she did not tell authorities about Mrs. Tayes's statement.

Mark Bowman, the Defendant's cousin, testified that he and the victim had been friends. He agreed that the victim could be violent and aggressive "[e]specially when he was all hopped up" on methamphetamine. Mr. Bowman recalled that, about two or three

months before his death, the victim told him that he had a brain tumor and did not have long to live. However, Mr. Bowman never heard the victim threaten to kill anyone. Mr. Bowman agreed that the victim carried a knife and said that the victim was "well known for throwing knives."

Jonathan Randolph testified that he was at the Defendant's residence several times in the hours preceding the shooting. Mr. Randolph explained that he was at the Defendant's residence on the evening of September 16, 2012, when the Defendant needed to take a shower and asked him to leave. Mr. Randolph returned to the Defendant's trailer about thirty minutes later and knocked on the door; however, the Defendant answered and said, "[G]ive me a few more minutes man[.]" While he waited on the Defendant, Mr. Randolph parked by a privacy fence in the back of the Defendant's driveway and sat in his car talking to his girlfriend. He went back to the Defendant's door about thirty minutes later, but it appeared that the Defendant had just gotten out of the shower, and Mr. Randolph returned to his car again. Mr. Randolph testified that no other cars pulled into the Defendant's driveway during this time. When he went back to the door a third time, Mr. Randolph noticed that the door looked like it had been kicked in, and the victim answered the door. Mrs. Tayes, who was inside the Defendant's trailer, went out to her car and appeared to be "going through stuff." The victim asked Mr. Randolph, "[W]hat would you do if you caught your wife down here messing with your friend[?]" Mr. Randolph told the victim to come home with him. However, the victim was "high" on methamphetamine, and Mr. Randolph could not convince the victim to leave. Mr. Randolph testified that the victim had a reputation for being "a little wild" and "a little paranoid" while on drugs.

Mr. Randolph left the Defendant's residence and returned to his own home nearby. He tried sending the Defendant several text messages, but the Defendant did not answer. Mr. Randolph testified that he "got a bad vibe" about the situation. He stated that, although the victim had said the Defendant was asleep, he thought that the victim may have hurt the Defendant. Mr. Randolph drove back to the Defendant's home, and again, the victim answered the door. The victim attempted to block Mr. Randolph's view into the residence, but he could see Mrs. Tayes lying on the floor crying. Mr. Randolph testified that he thought the victim had killed the Defendant, and he tried to get the victim to leave the scene because he was worried that the victim was going to kill Mrs. Tayes. The victim said, "I'm not going no damn where, you can take this b**** with you if you want to, but I'm not going nowhere." The victim again told Mr. Randolph that the Defendant was asleep. Mr. Randolph testified that he returned home and picked up two of his friends. When they returned to the Defendant's residence, the police had already arrived.

Mrs. Tayes was recalled by the State as a rebuttal witness. She stated she did not know Ms. Maynard. She further stated that, when she went to the store to purchase groceries and to a market for cigarettes and beer, she had no injuries to her face. Mrs. Tayes denied telling Ms. Maynard that she intended to frame the Defendant in order to protect her children.

Tim Nash testified that he was the Jail Administrator for the Putnam County Sheriff's Department and that he was in charge of the jail's records. Mr. Nash stated that he pulled inmate records to review any time that Ms. Maynard and Mrs. Tayes were at the Putnam County Jail. He stated that his review of the records showed that Ms. Maynard and Mrs. Tayes were never at the jail at the same time. He explained that Mrs. Tayes was only at the jail for about twelve hours from September 20, 2012, to September 21, 2012, and that she was held in a single-person holding cell during this time.

Following deliberations, the jury found the Defendant guilty of reckless homicide, as a lesser included offense of first degree premeditated murder as charged in count 1, and assault, as charged in count 3. The jury acquitted the Defendant on counts 2 and 4. The trial court sentenced the Defendant, as a Range I standard offender, to concurrent terms of four years for reckless homicide and eleven months and twenty-nine days for assault. The trial court ordered the Defendant to serve his sentence in confinement. The Defendant subsequently filed a timely motion for new trial, which the trial court denied after a hearing. This timely appeal followed.

## II. Analysis

### A. Jury Instructions on Lesser Included Offenses

The Defendant asserts that the trial court erred by denying his motion for an "all or nothing" jury charge and by instructing the jury on all lesser included offenses. The Defendant argues that because the Tennessee Supreme Court has recognized in the context of ineffective assistance of counsel, that there may be a "cogent trial strategy" in submitting an "all or nothing" jury charge, that defendants in Tennessee are constitutionally entitled to an "all or nothing" jury charge if requested. He contends that he had a constitutional right to waive his right to lesser included offenses. The Defendant asserts that because there was a knowledgeable waiver of a jury instruction on lesser included offenses and the State did not object "due process required the trial court to accept his request for an 'all or nothing' jury charge." The State responds that the trial court properly charged the jury on lesser included offenses.

Before trial, the Defendant filed a motion regarding lesser included offenses, in which the Defendant requested that the trial court charge the jury "with only the offenses as contained in th[e] indictment" and not charge any lesser included offenses. The trial court denied the motion, finding that the evidence at trial supported an instruction on lesser included offenses and that applicable law "both permits and requires instructions on lesser included offenses."[3] Accordingly, the trial court instructed the jury in Count 1 on the lesser included offenses of second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide.

The United States Constitution and the Tennessee state constitution guarantee criminal defendants the right to trial by jury. U.S. Const. amend. VI; Tenn. Const. art. I, § 6 (providing "that the right of trial by jury shall remain inviolate"). This right includes an entitlement to a correct and complete charge of the law. State v. Page, 184 S.W.3d 223, 229 (Tenn. 2006) (citing State v. Teel, 793 S.W.2d 263, 249 (Tenn. 1990)). Moreover, it is well-established that the right to a correct and complete charge of the law includes the right to jury instructions "on each and every lesser[-]included offense embraced within the charged offense(s) and supported by the proof[.]" State v. Davis, 266 S.W.3d 896, 902 (Tenn. 2008) (citing State v. Ely, 48 S.W.3d 710, 727 (Tenn. 2001).

Tennessee Code Annotated section 40-18-110 states:

> When requested by a party in writing prior to the trial judge's instructions to the jury in a criminal case, the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser included offense of the offense charged in the indictment or presentment. However, the trial judge shall not instruct the jury as to any lesser included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense. In making this determination, the trial judge shall view the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of evidence. The trial judge shall also determine whether the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser included offense.

Tenn. Code Ann. § 40-18-110(a) (2015). When a trial court receives no written request from a party "specifically identifying the particular lesser included offense or offenses on

---

[3] In his brief, the Defendant asserts that the State did not object to his motion regarding lesser included offenses. However, this is not clear from the record. The State did not file a written response, and the record does not contain a transcript of the trial court's ruling on the motion at trial.

which a jury instruction is sought," the trial court may instruct the jury "on any lesser included offense or offenses, but no party shall be entitled to any lesser included offense charge." Tenn. Code Ann. § 40-18-110(b) (2015). Code Section 40-18-110 further provides:

> Prior to instructing the jury on the law, the trial judge shall give the parties an opportunity to object to the proposed lesser included offense instructions. If the defendant fails to object to a lesser included offense instruction, the inclusion of that lesser included offense instruction may not be presented as a ground for relief either in a motion for a new trial or on appeal. Where the defendant objects to an instruction on a lesser included offense and the judge does not instruct the jury on that offense, the objection shall constitute a waiver of any objection in the motion for a new trial or on appeal concerning the failure to instruct on that lesser included offense. The defendant's objection shall not prevent the district attorney general from requesting lesser included offense instructions or prevent the judge from instructing on lesser included offenses.

Tenn. Code Ann. § 40-18-110(d) (2015) (emphasis added). Whether the trial court properly instructed the jury on a certain offense is a mixed question of law and fact, which this court reviews de novo with no presumption of correctness. State v. Howard, ___ S.W.3d ___, 2016 WL 5933430, at *3 (Tenn. 2016) (citing State v. Thorpe, 463 S.W.3d 851, 859 (Tenn. 2015)).

We believe our resolution of this issue is controlled by the Tennessee Supreme Court's decision in State v. Bolden, 979 S.W.2d 587 (Tenn. 1998). In Bolden, the defendant was charged with premeditated first degree murder and was willing to gamble on an "all or nothing" verdict by requesting that the trial court not charge the lesser included offense of second degree murder. Id. at 589. The trial court denied the defendant's request, and the defendant was subsequently convicted of second degree murder. Id. In concluding that the trial court did not err in charging the lesser included offense of second degree murder over the defendant's objection, the supreme court emphasized that one purpose of Tennessee Code Annotated section 40-18-110 was "to protect the right to trial by jury by instructing the jury on the elements of all offenses embraced by the indictment." Id. at 593. While acknowledging that "it often benefits the defendant to have a jury consider lesser offenses," our supreme court stated that "the mandatory nature of the statute indicates that it facilitates the overall truth-seeking function of the process." Id. In this regard, the supreme court quoted with approval the following from the California Supreme Court:

A trial court's failure to inform the jury of its option to find the defendant guilty of [a] lesser offense would impair the jury's truth-ascertainment function. Consequently, neither the prosecution nor the defense should be allowed, based on their trial strategy, to preclude the jury from considering guilt of a lesser offense included in the crime charged. To permit this would force the jury to make an "all or nothing" choice between conviction of the crime charged or complete acquittal, thereby denying the jury the opportunity to decide whether the defendant is guilty of a lesser included offense established by the evidence.

Id. (quoting People v. Barton, 906 P.2d 531, 536 (Cal. 1995).

In light of the foregoing, we conclude that the trial court did not err when it denied the Defendant's request to not charge any lesser included offenses of first degree premeditated murder. The Defendant was not entitled, as a matter of trial strategy, to preclude the jury from considering his guilt as to a lesser offense included in the crime charged. See id. Because reckless homicide is a lesser included offense of first degree murder, State v. Wilson, 92 S.W.3d 391, 394 (Tenn. 2002), the only remaining question is whether the evidence was legally sufficient to sustain a conviction for the lesser included offense of reckless homicide. See Bolden, 979 S.W.2d at 593. As explained below, we conclude that the evidence was sufficient.

## B. Sufficiency of the Evidence

The Defendant contends that his convictions for reckless homicide and assault should be reversed because the evidence at trial did not support the convictions. He argues that he acted in defense of himself and Mrs. Tayes by shooting the victim, who was "impaired, delusional, and very dangerous" and had "brutally attack[ed] his own wife over the course of several hours." The State responds that sufficient evidence was presented to support the convictions of reckless homicide and assault.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact-finder. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. Id. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

- 16 -

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. Bland, 958 S.W.2d at 659; Tuggle, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

## 1. Reckless Homicide

Tennessee Code Annotated section 39-13-215 defines reckless homicide as a "reckless killing of another." Tenn. Code Ann. § 39-13-215(a) (2015). The criminal code further instructs that:

> "[r]eckless" refers to a person who acts recklessly with respect to . . . the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(c) (2015).

When viewed in the light most favorable to the State, the evidence shows that the Defendant retrieved a .243 Winchester Rossi rifle from his bedroom and confronted the victim with the rifle. When the victim fled out the back door of the trailer, the Defendant followed him outside and shot at the victim, who was "already down the steps" of the back porch, hitting the victim in the back and causing the victim's death. Although the Defendant told Agent Miller that he fired the rifle merely to scare the victim, the Defendant admitted that he fired in the direction that the victim ran. From this proof, a rational juror could have found that the Defendant consciously disregarded a substantial and unjustifiable risk that he could shoot and kill the victim by firing his rifle in the direction that the victim ran.

The Defendant contends that the evidence shows that his shooting the victim was justified because he was acting in self-defense and in defense of another person. Tennessee Code Annotated section 39-11-611 provides:

- 17 -

[A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2)(A)-(C) (2015). Relative to defense of a third person Tennessee Code Annotated section 39-11-612 provides:

A person is justified in threatening or using force against another to protect a third person, if:

(1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39-11-611 in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and

(2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

Tenn. Code Ann. § 39-11-612 (2015). A defendant's conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified under these statutory defenses. State v. Bult, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998). Thus, the mere fact that a defendant believes that his conduct is justified would not suffice to justify his conduct. Id.

It is well-established "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)). Moreover, "[t]he State carries the burden of proving that the defendant did not act in self-defense." State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001) (citing State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996)). As such, "in the context of judicial review of the jury verdict, in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a

- 18 -

reasonable doubt as to his conduct being criminal." State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

The Defendant asserts that the proof was "abundantly clear" that the victim broke into his home and attacked Mrs. Tayes for several hours and that, when he shot the victim, he had a reasonable belief of imminent danger of death or serious bodily injury to himself and Mrs. Tayes. However, we note that, when the Defendant confronted the victim with the rifle, the victim immediately ran from the Defendant and out the back door of the trailer. The victim was unarmed, and the Defendant admitted that he did not see the victim with a weapon of any kind. Nonetheless, the Defendant followed the victim outside and shot the victim, in the back, after the victim was "already down the steps." Although the Defendant told Agent Miller that he believed the victim was chasing Mrs. Tayes, Mrs. Tayes testified that she was standing behind the Defendant when he exited his bedroom, confronted the victim, and followed the victim out the back door. Under the circumstances in this case, the jury was warranted in concluding that it was unreasonable for the Defendant to believe that deadly force was immediately necessary to protect him or Mrs. Tayes against an imminent threat of death or serious bodily injury.

## 2. Assault

Count 3 of the indictment charged that the Defendant committed assault by intentionally or knowingly causing Mrs. Tayes to reasonably fear imminent bodily injury. See Tenn. Code Ann. § 39-13-101(a)(2) (2015). "Bodily injury" can include "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(2) (2015).

The evidence presented by the State established that Mrs. Tayes attempted to call 911 after the shooting to get help for the victim, who was still alive. However, while still holding the rifle, the Defendant threatened that he would shoot Mrs. Tayes if she did not give him her cell phone. When Mrs. Tayes told the Defendant that she had dropped her phone, he grabbed her arm, bent it over a fence in the yard, and said he was going to "break [her] f***ing arm" if she did not give him the phone. Then, in their struggle over the phone, the Defendant bit Mrs. Tayes on the nose. The proof was sufficient for a rational juror to find that that the Defendant intentionally or knowingly caused Mrs. Tayes to reasonably fear imminent bodily injury. The Defendant is not entitled to relief on this claim.

## C. Merger of Assault and Reckless Homicide Convictions

The Defendant also contends that principles of double jeopardy mandate that his conviction for assault be merged into his conviction for reckless homicide. He alleges that he was convicted of multiple criminal offenses under different statutes but that the statutes punish the same offense. The Defendant asserts that his conduct of chasing and shooting the victim involved the same victim and was "one episode of criminal conduct" and not separate and distinct acts for which dual convictions can be maintained. The State responds that the Defendant waived consideration of this issue by failing to raise it before the trial court and that he cannot establish plain error.

We first note that the Defendant is incorrect in his assertion that the two offenses were committed against the same victim. As previously explained, the indictment alleged that the Defendant committed first degree premeditated murder against Donnie Wayne Tayes in Count 1 and assault against Angel Tayes in Count 3. Clearly, the Defendant committed acts against two different victims.

Regardless, as pointed out by the State, the Defendant did not raise this issue in his motion for new trial; therefore, it is waived. Tenn. R. App. P. 3(e) (providing "that in all cases tried by a jury, no issue presented for review shall be predicated upon error . . . or other action committed or occurring during the trial of the case . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived[]"). Nonetheless, this court may still grant relief under plain error review if the following requirements are satisfied:

> (a) the record . . . clearly establish[es] what occurred in the trial court; (b) a clear and unequivocal rule of law . . . [was] breached; (c) a substantial right of the accused . . . [was] adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. Smith, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007).

We agree with the State that the Defendant cannot show any plain error in this case as no clear and unequivocal rule of law was breached. The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, states, "No person shall . . . be subject for the same

offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Similarly, the Tennessee Constitution guarantees "[t]hat no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. Both clauses provide three distinct protections: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012). The Defendant argues that this case falls into the third category, multiple punishments for the same offense.

Single prosecution, multiple punishment claims ordinarily fall into one of two categories: (1) "unit-of-prosecution" or (2) "multiple description" claims. Id. at 543. As relevant here, multiple description claims arise in cases where the defendant has been convicted of multiple criminal offenses under different statutes but alleges that the statutes punish the same offense. Id. at 544. When reviewing multiple description cases, courts must determine whether the defendant committed two offenses or only one. Id. To do so, courts apply the test articulated in Blockburger v. United States, 284 U.S. 299, 304 (1932). Id. Pursuant to the Blockburger test, the threshold inquiry is whether the defendant's convictions arose from the same act or transaction. Id. at 545. If the offenses did not arise from the same act or transaction, then double jeopardy protections are not implicated, and the inquiry ends. Id.

In this case, double jeopardy protections are not implicated because the Defendant's convictions arose from separate instances of criminal conduct committed against two separate victims. In Count 1, the Defendant was convicted of recklessly killing Donnie Wayne Tayes by shooting the victim in the back as the victim fled the Defendant's trailer. In contrast, the Defendant's assault conviction in Count 3 pertained to his threatening to shoot Mrs. Tayes and break her arm when she refused to turn over her cell phone to the Defendant. The proof established discrete acts and separate victims which were capable of being separated into multiple offenses; therefore, double jeopardy is not implicated. Thus, the trial court's failure to merge the Defendant's convictions did not violate a clear and unequivocal rule of law. The Defendant is not entitled to relief under plain error.

## III. Conclusion

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE